1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-FILED: 01.21.10**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JANIS UQUILLAS,                                   )
                          Plaintiff,              )   CASE NO. CV 07-00542 MMM (AJWx)
                                                  )
            vs.                                   )   FINDING OF FACT AND
                                                  )   CONCLUSIONS OF LAW
UNUM LIFE INSURANCE COMPANY                       )
OF AMERICA AND PAREXEL                            )
INTERNATIONAL CORPORATION                         )
LONG TERM DISABILITY PLAN,                        )
                                                  )
                          Defendants.             )

        Plaintiff Janis Uquillas filed this action on January 23, 2007, against UNUM Life

Insurance Company of America ("UNUM") and Parexel International Corporation Long Term

Disability Plan (the "Plan").  Uquillas alleges that she was denied long-term disability benefits

to which she was entitled under the Plan, a disability benefit plan established by her employer

Parexel International Corporation ("Parexel"), and insured by UNUM.  Uquillas contends that

UNUM's decision to terminate her benefits was an abuse of discretion.  After reviewing the

administrative record and considering the parties' trial briefs, the court makes the following

findings of fact and conclusions of law.

# I. FINDINGS OF FACT

### A.   The Plan

1. The Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), because it is an employee benefit plan funded by plaintiff's employer.[1]

2. UNUM was the Plan Administrator.

3. Under the Plan, an employee is considered disabled and entitled to payments when the employee is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury," and experiences "a 20% or more loss in [her] indexed monthly earnings due to that sickness or injury."[2]

### B.   Uquillas' Employment

4. Uquillas was employed as a Senior Manager in Parexel's "Clinical Process Management and Training Group."[3]  Her position was largely a "desk job" that required lifting less than ten pounds "on occasion."[4]  Its responsibilities included overseeing "clinical and technical training and development for clinical staff" in connection with Parexel's research studies on behalf of pharmaceutical companies seeking FDA approval for new drugs.[5]

### C.   Onset of Uquillas' Symptoms and Initial Claim

5. Uquillas' disability claim arises out of increased symptoms of pain that began some time in December 2003.  Uquillas' representations regarding the onset of the increased pain are inconsistent.  Prior to the onset of the symptoms, in 2002, Uquillas had been treated by

---

[1]Administrative Record ("AR") at UASP 10001.

[2]AR at UASP 10015.

[3]*Id.* at UACL 75.  UNUM's claims file is numbered using the "UACL" prefix; the policy is numbered using the "UASP" prefix.  For convenience, the court omits the "UACL" prefix in further citations to the claims file.

[4]*Id.* at 636.

[5]*Id.* at 469, 502.

1   Dr. Charles Jablecki, a neurologist.[6]

2   6.   On December 24, 2003, Uquillas initially told Jablecki that the increased pain began on

3   December 14, 2003, when "she arose from a couch and felt some pain in her left low back

4   and buttock area."[7]

5   7.   Later, on January 15, 2004, Uquillas, apparently for the first time, "raised the possibility"

6   that "her problem with her left low back and pain m[ight], in fact, be work related."[8] She

7   stated that "heavy lifting associated with the moving of her office took place for a period

8   of about a week" coincident with the time her pain appeared on December 14, 2003.[9] On

9   February 3, 2004, she told Jablecki that "several weeks of repetitive lifting at work"

10   preceded the appearance of the symptoms on December 14, 2003.[10] On her application for

11   disability benefits, Uquillas stated that the claim was based on an injury that occurred on

12   December 2, 2003 when she was moving office furniture and boxes.[11] On an application

13   for workers' compensation benefits, Uquillas stated that the her injury resulted from an

14   accident on December 3, 2003.[12]

15   8.   Uquillas first sought treatment for the pain on December 18, 2003.  That day, she went

16   to the emergency room because the pain, as she later told Jablecki, had become

17   "intolerable."  Uquillas left the emergency room when she was told there would be a two-

18   hour wait, and took prescription painkillers she had at home.  She reported that these did

19

20

21   _____

22   [6]*Id.* at 111

23   [7]*Id.* at 9.

24   [8]*Id.* at 128.

25   [9]*Id.* at 128.

26   [10]*Id.* at 139.

27   [11]*Id.* at 26.

28   [12]*Id.* at 172.  The worker's compensation claim was denied on April 8, 2004.  (*Id.*)

3

1     not relieve the pain.[13]

2  9.  Uquillas returned to the emergency room on December 21, 2003, and was admitted.  She

3     was given IV Dilaudid and Valium for pain and Phenergan for vomiting. The physicians

4     contacted Jablecki, who recommended that Dr. Paul Raffer, a neurologist with privileges

5     at the hospital, evaluate Uquillas.  Raffer conducted an MRI scan of Uquillas' spine, which

6     "showed only mild degenerative changes with no disk protrusion."[14]  Jablecki considered

7     the MRI "normal."[15]  Uquillas reported a slight improvement after bed rest and taking

8     Solumedrol.[16]  A CT scan was performed on December 24, and Uquillas was discharged

9     to see Jablecki.[17]

10  10.  Uquillas first saw Jablecki for the symptoms in question on December 24, 2003.[18]  As

11     noted, Uquillas stated at that time that the pain began when she got up from her couch on

12     December 14, 2003.  She reported that the pain was constant but was worse if she tried

13     to extend her leg while seated.[19]  She was not taking any medications at the time of the

14     visit.[20]  Jablecki conducted "[l]imited EMG studies of the left lower extremity," which he

---

16     [13]*Id.* at 101.

17     [14]*Id.*

18     [15]*Id.* at 105.

19     [16]*Id.* at 101.

20     [17]*Id.* at 102.

22     [18]Jablecki saw Uquillas on December 2, 2003.  This appointment was for symptoms other
23     than the new low back pain which Uquillas initially reported as beginning on December 14, 2003.
       At the December 2, 2003 visit, Uquillas complained of stiffness and pain in her feet, numbness
24     and sharp pains in her hands, mid-back pain, and a burning sensation on her tongue which
       occurred when she brushed her teeth of chewed gum.  (*Id.* at 91-92.)  Defendants note that there
25     is no mention in Jablecki's notes of the consultation of any accident that occurred when Uquillas
       was moving office furniture.  However, nothing in the record indicates what time the December
26     2 appointment occurred, and it may have occurred before Uquillas started work for the day.

27     [19]*Id.* at 101.

28     [20]*Id.*

4

reported were "abnormal" and "compatible with acute nerve pathology affecting the left L5 nerve root."[21] Jablecki noted that his "clinical examination suggest[ed] that there [was] compression of a nerve root as a cause of [Uquillas'] symptoms."[22] He prescribed OxyContin for pain control.[23]

11. On December 26, 2003, Uquillas was admitted to UCSD Medical Center, and seen by neurology, neurosurgery, and pain management specialists.[24]

12. On December 29, 2003, Jablecki performed "EMG and nerve conduction studies of the lower left extremity," which he again found to be "abnormal" and "compatible with acute nerve pathology affecting the left L5 nerve root.[25] He prescribed an MRI for further analysis.[26] Uquillas also received a steroid injection from Dr. Mark Wallace on December 29 and 30.[27]

13. Dr. William Ladd performed an MRI of Uquillas' lumbar spine on December 30, which was "negative."[28]

14. Jablecki saw Uquillas again on January 5, 2004. He noted that her problem had "evolved in a favorable way," and that she was able to walk without a cane, although he noted that she continued to require pain management for severe, constant pain.[29] It is unclear what,

---

[21]*Id.* at 104.

[22]*Id.* at 105.

[23]*Id.* at 106.

[24]*Id.* at 109.

[25]*Id.* at 112.

[26]*Id.* at 114.

[27]*Id.* at 118.

[28]*Id.* at 120.

[29]*Id.* at 121-22.

if any, medication Uquillas was taking at the time.[30]  Jablecki prescribed Zofran to relieve the nausea Uquillas experienced with OxyContin and Fentanyl; Uquillas had these drugs, but had not been taking them due to side effects.[31]  Uquillas also received another steroid injection from Wallace on January 5.[32]

15.    From January 7 to 9, 2004, Uquillas returned to her job and worked at the office.  From January 10 through 20, she worked from home part-time.[33]  Uquillas told UNUM that her doctors "made her stop" working part-time.[34]  However, there is nothing in the doctors' records to support this.  Rather, on January 15, Uquillas told Jablecki that she had tried to return to work, but stopped going to the office because she "had too much pain."[35]

16.    Jablecki saw Uquillas on January 15, 2004; at that point, she was taking Elavil to help her sleep, and continued to be able to walk without a cane.[36]  She was not taking any analgesics.  Jablecki noted that the problem continued to evolve favorably, but concluded that Uquillas would not be able to return to work until March 1, 2004 "given the slow rate of progress of her problem and the severity of the current pain."[37]  Uquillas also received a third steroid injection from Wallace on January 15.[38]

17.    Jablecki again saw Uquillas on January 26, 2004.  He noted that she was still taking only Elavil, as "[t]he pain has not been sustained or great enough to have to take narcotic

---

[30]*Id.* at 118.

[31]*Id.* at 122.

[32]*Id.* at 124.

[33]*Id.* at 503.

[34]*Id.* at 503.

[35]*Id.* at 128.

[36]*Id.* at 124.

[37]*Id.* at 128.

[38]*Id.* at 130.

analgesics."[39]  He reported that Uquillas had undergone three steroid injections; the first resulted in improvement in her condition, but there was "minimal improvement" following the next two.[40]   Jablecki indicated that he was still unable to diagnose the cause of Uquillas' condition.  He recommended a CT myelogram; because of Uquillas' concerns regarding complications related to the procedure, however, Jablecki decided to proceed with a CT scan of her lumbosacral spine.[41]  Uquillas was able to drive herself to the appointment.[42]

18.   Jablecki saw Uquillas again on February 3, 2004.  She was still taking only Elavil and was able to walk and drive.[43]  Her pain continued to improve and was "usually [at] a 4-5/10" level.[44]  Jablecki noted that the CT scan was "normal," as were "blood studies [designed] to evaluate [her] for systemic disorders [that might be] the cause of a radiculopathy."[45]  Jablecki concluded: "I remain optimistic that [Uquillas] will be able to return to work, at least part-time, on March 1, 2004."[46]

19.   During the February 3, 2004 visit, Jablecki helped Uquillas fill out a worker's compensation claim.  According to Jablecki, "[t]he basis for filing the claim was that the symptoms began [on December 14, 2003] when she simply turned over at home on a couch after carrying out several weeks of repetitive lifting activity at work"; the lifting at work, "if not the proximate cause, [was] an aggravating factor, which led to the development of

---

[39]*Id.* at 130.

[40]*Id.* at 133.

[41]*Id.* at 134.

[42]*Id.*

[43]*Id.* at 135.

[44]*Id.*

[45]*Id.* at 138-39.

[46]*Id.* at 139.

1    radiculopathy."[47]

2    20.   Jablecki saw Uquillas again on February 17, 2004.  Uquillas was taking only Elavil on a

3          regular basis; she reported that she took Motrin or Aleve when the pain increased, but that

4          "[t]he pain ha[d] not been so great that she ha[d] needed to take narcotic analgesics."[48]

5          Jablecki again performed EMG and nerve conduction studies; once again, he found them

6          "abnormal" and "compatible left L5 radiculopathy."  He observed that "[c]ompared to the

7          study performed [on] December 29, 2003, there is no evidence of new nerve pathology."[49]

8          He noted that Uquillas planned to attempt to resume working part-time from home on

9          March 1, and expressed agreement with this plan.[50]  Uquillas was able to walk without a

10         cane and drive herself to the appointment.[51]

11   21.   Uquillas did not return to work on March 1; on March 9, she again saw Jablecki, reporting

12         that the pain was "somewhat worse."[52]  She continue to take only Elavil on a regular basis

13         and Motrin and Aleve if she experienced a "flare-up" of pain.  Jablecki reported that

14         Uquillas also took Vicodin on occasion.[53]  He noted that Uquillas had "discuss[ed] the

15         possibility of doing a few hours of work at home, but this [was] not acceptable to her

16         employer.  She is now considering taking a job . . . close to home so she would not have

17         to make a two hour drive everyday which she currently would have to do."[54]

18   22.   On March 16, 2004, Uquillas saw Dr. Larry Dodge "to determine if her. . . problem [was]

19   _____

20   [47]*Id.*

21   [48]*Id.* at 140.

22   [49]*Id.* at 142.

23   [50]*Id.* at 144.

24   [51]*Id.* at 140.

25   [52]*Id.* at 149.

26   [53]*Id.*

27   [54]*Id.* at 153.

28

1    work-related."[55]  Dodge took radiographs, which indicated "no instability."[56]

2    23.    At a March 24, 2004 appointment with Jablecki, Uquillas reported that her condition was

3          worse.  She was taking Elavil regularly and Aleve for "flare-ups."  Jablecki also noted that

4          Uquillas had taken Vicodin "probably twice since she was last seen.[57]  Uquillas told

5          Jablecki that while at Dodge's office, she had seen "a note on the desk from the insurance

6          carrier which indicated that she was misrepresenting information."  She said this "upset

7          her very much."[58]

8    24.    In his records of the March 24 appointment, Jablecki noted three available options for

9          treatment: (1) continued rest and medication "with the hope that her problems will

10         improve"; (2) additional steroid injections; and (3) a CT myelogram "with the hope that

11         a surgically correctable problem can be identified."[59]  He stated that Uquillas was

12         "temporarily and totally disabled form her full work . . . because the work requires

13         prolonged sitting and this activity aggravates the left buttock and leg pain."[60]  He noted

14         that Uquillas had decided not to accept the position closer to home that had been discussed

15         at the previous appointment.[61]

16   25.    On April 5, 2005, Uquillas filed a claim for disability benefits.[62]  In Uquillas' application,

17         Jablecki indicated that she could not bend, stoop or lift more than five pounds; kneel or

18

19

20   [55]*Id.* at 153.  Jablecki is the one who indicated that this was the purpose of the visit to
     Dodge.  There is no indication in the record as to the conclusion, if any, that Dodge reached.

21   [56]*Id.* at 155.

22   [57]*Id.*

23   [58]*Id.*

24   [59]*Id.* at 158.

25   [60]*Id.* at 158-59.

26   [61]*Id.* at 159.

27   [62]*Id.* at 454.

28

9

squat; drive more than twenty minutes at a time once a day; stand more than two minutes at a time; or sit more than five minutes at a time.[63]

26. At an April 5 appointment, Jablecki considered Uquillas' condition "relatively stable" but "worsening," and again urged her to consider the myelogram.[64]  Uquillas reported the same taking the same medications as she had been at the time of the previous appointment.[65]  She was able to walk without assistance.[66]  Jablecki concluded that Uquillas would be unable to work through July 30, 2008.

27. On April 8, 2004, Uquillas' worker's compensation claim was denied.[67]  The reasons for the denial are not in the record.  Uquillas later told an UNUM employee, however, that the claim was denied because a co-worker told an investigator that she did not move furniture.  Uquillas asserted that this was a lie and said that the co-worker was trying to "get back" at her because Uquillas had been accumulating information to support terminating the co-worker for incompetence.[68]

**D.     Increased Symptoms and Prescription for Bed Rest**

28. On the evening of April 12, 2004, Uquillas reported an increase in pain, and went to an urgent care facility where she was seen by a Dr. Cochrane.  Uquillas was given Tigan and morphine, and a prescription for Zofran to control nausea.[69]

29. Jablecki saw Uquillas on April 13.  She continued to take Elavil, and Jablecki noted that

---

[63]*Id.* at 452.

[64]*Id.* at 163.

[65]*Id.* at 160.

[66]*Id.* at 161.

[67]*Id.* at 172.

[68]*Id.* at 486-87.

[69]*Id.* at 164.

she had taken Valium, Baclofen and Ibuprofen that morning.[70]  Jablecki recommended that Uquillas restart OxyContin.,[71] and observed that she was "walking with the assistance of her husband because she has too much pain to walk on her own."[72]  Jablecki suggested that Uquillas be evaluated by Dr. Lawrence Marshall, a neurosurgeon, for a myelogram and possible surgery.  Due to the fact Uquillas' condition was worsening, he recommended that "disability be extended through July 30, 2004."[73]

30.   On May 5, 2004, Uquillas saw Marshall, who recommended total bed rest for one month to treat her reoccurring symptoms.[74]

31.   On June 16, 2004, Uquillas saw Marshall again.[75]  Other than noting that Uquillas was "still having pain" that was "a bit better," the record of this visit is uninformative.[76] Jablecki's notes of a June 22, 2004 consultation with Uquillas, however, indicate that Marshall had recommended that she continue bed rest, "remaining as inactive as possible for six more months."  Jablecki reported that Uquillas complied with the recommendation of strict bed rest for three weeks, and did not experience much pain; when she tried to be more physically active after three weeks, however, she experienced increased pain. Jablecki noted that Uquillas had ceased taking pain medication while on bed rest, but had begun to take Vicodin once she tried to be more active.[77]  Jablecki recommended that Uquillas "[f]ollow Dr. Marshall's advice to resume a very inactive lifestyle while waiting

---

[70]Id.

[71]Id. at 166.

[72]Id. at 164.

[73]Id. at 167.

[74]Id. at 354, 420.

[75]Id. at 436.

[76]Id.

[77]Id. at 384.

for spontaneous resolution of the radiculopathy."[78]    He concluded that she remained "temporarily and totally disabled" due to the radiculopathy, and recommended that "disability be extended through August 31, 2004."[79]

### E.    Initial Approval of Claim

32.    On June 16, 2004, UNUM approved Uquillas' LTD benefits claim.  UNUM sent Uquillas a letter stating that "[b]ased on information in your claim file, we have found it reasonable to support your disability through your follow-up appointment with your neurologist Dr. Lawrence Marshall."[80]

### F.    Further Investigation and Denial of Claim

33.    On July 16, 2004, three registered nurses employed by UNUM reviewed Uquillas' file.  The team concluded that Uquillas' "[r]eports of pain exceed[ed] [the] medications [she had] taken for pain relief."[81]  They also noted that "bed rest for 6 months [was] not [a] usual treatment for radiculopathy" and that the anticipated muscle atrophy that would result from a month of bed rest was not documented in the file.[82]  They concluded that the treatment appeared "inappropriate" and that "[i]mpairment of functional capacity [was] unclear."[83]

34.    The extent to which Uquillas followed Marshall's instructions is uncertain.  On July 26, she told UNUM that she took "the dog out for a walk and [was] unable to stay in bed the

---

[78]*Id.* at 387.

[79]*Id.* at 387.

[80]*Id.* at 315.

[81]*Id.* at 420.

[82]*Id.* at 421.

[83]*Id.*

whole time."[84]  She also indicated that she was no longer seeing Marshall.[85]

35.  Uquillas saw Jablecki next on August 26, 2004.  He noted that Uquillas took pain medications – "Vicodin, Advil, Baclofen" – "[v]ery occasionally."  She walked without assistance and drove herself to the appointment.[86]  Uquillas told Jablecki she no longer required the assistance of Wallace, the pain management specialist.  Jablecki concurred with Marshall's recommendation of continued bed rest through December 31, 2004, and on that basis concluded that Uquillas remained "temporarily and totally disabled."  His notes indicate that he continued to await "spontaneous resolution" of Uquillas' condition.[87]  He did not record any muscle atrophy or weakness.[88]

36.  On October 4, 2004, UNUM arranged for a "field report," i.e., an  interview with Uquillas at her home.  Ed Ruiz visited Uquillas on October 14, 2004 and conducted an interview that lasted approximately one and a half hours.[89]  Uquillas sat in a chair, frequently shifted positions and complained of pain.  Ruiz, however, did not "notice any facial expressions of pain."[90]  Uquillas stated that her pain level fluctuated throughout the day and that she was unable to tolerate sitting more than fifteen minutes at a time.[91]  She reported taking Baclofen, Flexeril and Darvocet as needed for pain.[92]  She described her activities as follows: 1 to 2 hours per week at the computer, a few minutes at a time,

---

[84]*Id.* at 433.

[85]*Id.*

[86]*Id.* at 459.

[87]*Id.* at 462.

[88]*Id.* at 513.

[89]*Id.* at 500.

[90]*Id.* at 501.

[91]*Id.* at 504.

[92]*Id.*

"reading emails or researching her medical condition"; preparing meals for herself "sporadic[ally]" and for her family "sometimes"; grocery shopping with her husband once or twice a week; walking the dog for one block at most once a week; and driving her son to water polo practice fifteen minutes away from home 2 to 3 times per week.[93]

37.   Jablecki saw Uquillas again on October 26, 2004. She reported taking Darvocet for pain four times over the prior two months, Baclofen six times, Valium two times, Flexeril twelve times, and Soma six times.[94] Jablecki continued to recommend an inactive lifestyle and to await "spontaneous resolution" of the radiculopathy.[95]

38.   On November 22, 2004, UNUM employee Dr. Briack Brock reviewed Uquillas' file. He noted that the lack of recorded muscle atrophy was inconsistent with the prescribed regimen of bed rest, and concluded: "The only available objective medical information supporting [Uquillas'] stated symptomatology and dysfunction are EMG studies by her treating neurologist. Indirect reports of diagnostic imaging and clinical examinations have not provided objective neurologic or physical abnormalities commensurate with [her] stated symptomatology, dysfunction, and prolonged bed rest. . . .   Given that objective clinical and indirect reports of diagnostic imaging findings have not provided Neuropathic support for EMG findings, I do not find a defined pathologic basis on which to base estimation of restrictions and limitations."[96] Brock opined that it was "unclear why [Uquillas] would be precluded from sedentary work capacity, particularly if [she] had the ability to sit or stand as needed."[97]

39.   UNUM decided to discontinue Uquillas' benefits. It informed her of this decision in a

---

[93]*Id.* at 501-02.

[94]*Id.* at 518.

[95]*Id.* at 522.

[96]*Id.* at 514.

[97]*Id.* at 515.

14

letter dated December 9, 2004, and by telephone on December 10, 2004.[98]  The letter stated: "Based on your reported activity level, available clinical findings, limited therapy compared to stated severity of symptomatology/dysfunction, and the numerous inconsistencies on file, it is unclear why you would be precluded from performing the substantial duties of your own occupation based on your lower back pain.  Based on information on file we have concluded that you should have the capacity to lift up to 10 lbs. occasionally and sit for 6 to 8 hours of the work day, with the ability to adjust between sitting and standing as needed for comfort."[99]

## G.    Aftermath of Denial

40.    On December 17, 2004, Uquillas visited a different pain management specialist, Dr. J. Sorin Ispirescu.  She reported to him that her pain was continuous and "an 8-9 out of 10."[100]  He noted that her current medications were Elavil and Niaspan,[101] and recommended further steroid injections.[102]

41.    On December 21, 2004, Uquillas saw Jablecki.  She reported that she was now using Fentanyl patches every three days, and indicated that they affected her memory.[103] Jablecki found her "temporarily and totally disabled" through June 30, 2005, and recommended continued bed rest with short walks.[104]  He prescribed further MRI scans and

---

[98]*Id.* at 556-62, 569.

[99]*Id.* at 559.

[100]*Id.* at 602.

[101]Niaspan is for "hypercholestrolemia," apparently unrelated to Uquillas' pain.  (*Id.* at 576.)

[102]*Id.* at 602-03.

[103]*Id.* at 576.

[104]*Id.* at 578.

1    EMG studies.[105]

2    42.   Dr. Ben Jacobson conducted an MRI on December 28, 2004.  He found it to be an

3          "[e]ssentially normal study" with a "[v]ery small right paracentral disc protrusion at

4          approximately T7-8."[106]  There was "[n]o evidence of frank neural impingement" and

5          "[n]o central canal stenosis."[107]  Despite Jacobson's findings, Jablecki believed the MRI

6          might "explain [Uquillas'] increased pain over the last few months."[108]

7    43.   Jablecki conducted EMG studies on January 4, 2005.  He considered the findings

8          "compatible with a chronic active left L5 radiculopathy," and found a "more chronic

9          pattern" in comparison with his February 17, 2004 study.[109]

10   44.   Uquillas appealed UNUM's termination of benefits.  The day she commenced the appeal

11         is unclear;[110] UNUM sent her a letter on March 17, 2005 indicating that it had received her

12         appeal, although it commenced review of the decision earlier.[111]

13   45.   Dr. Brock reviewed Uquillas' file on January 31, 2005.  He questioned Jablecki's findings

14         of EMG abnormalities given the absence of "abnormalities of the paraspinal muscles."  He

15         noted that "Jablecki's clinical findings ha[d] been primarily based on inconsistent claimant

16         stated symptoms and demonstrated weaknesses and responses to examination."[112]

17         "Overall," Brock found it "difficult to determine that [Uquillas] had changes in her

---

19   [105]Id. at 578.

20   [106]Id. at 593.

21   [107]Id. at 592.

22   [108]Id. at 588.

23   [109]Id. at 589.

25   [110]Uquillas faxed UNUM a letter on January 11, 2005, which responded to the termination
26   letter.  (Id. at 606.)  She sent a more formal appeal letter on March 14, 2005.  (Id. at 649.)

27   [111]Id. at 661.

28   [112]Id. at 625

1    complaints as of her stated onset of disability." He noted that the absence of physical

2    therapy evaluations made it difficult to determine her physical capacities.[113]

3    46.   Jablecki saw Uquillas again on February 22, 2005. She reported that she was no longer

4    using Fentanyl patches, but was taking Darvocet, Baclofen and Soma occasionally.[114]

5    47.   On March 14, 2005, Brock telephoned Jablecki to discuss Uquillas' condition.[115] During

6    the conversation, Jablecki opined that Uquillas had at most two hours of "sedentary

7    capacity" and was unlikely to improve significantly until June 30, 2005.[116] Jablecki

8    asserted that Uquillas' reported symptoms were consistent with clinical findings, and that

9    he did not believe she was exaggerating her pain.[117] Brock disagreed, noting that the

10   medical testing and clinical findings were inconsistent with Jablecki's conclusions.[118] After

11   the discussion, Brock recommended a functional capacity evaluation ("FCE") to determine

12   Uquillas' physical capacity.[119]

13   **H.    Resumption of Payments and Further Investigation**

14   48.   On April 4, 2005, Unum reopened Uquillas' claim and resumed payments under a

15   reservation of rights, noting that the payments did not constitute an admission of

16   liability.[120]

17   49.   On April 14, 2005, at the request of her counsel, Uquillas was seen by Dr. Isaac Baskt,

---

20   [113]*Id.* at 626.

21   [114]*Id.* at 672.

22   [115]*Id.* at 655.

23   [116]*Id.*

24   [117]*Id.* at 667-68

25   [118]*Id.* at 655.

26   [119]*Id.*

28   [120]*Id.* at 725.

a neurologist.[121]   Baskt conducted EMG studies on April 19, which he found to be consistent with chronic left L5 radiculopathy.[122]

50.   Because Uquillas had a history of unstable angina, UNUM was required to obtain a prescription from Jablecki before it could conduct the FCE.[123]   Because he believed the FCE was premature, Jablecki declined to write the prescription.[124]   On April 25, Brock concluded, on further examination of Uquillas' medical records, that she had no history of heart-related concerns and that her chest pain was related to gastroesophageal reflux disease.[125]

51.   UNUM thus attempted to schedule an FCE on May 12, 2005.   Uquillas indicated that her doctors would not permit the evaluation.[126]   Dr. Jerry DiDonna, a cardiologist, reviewed Uquillas' records and found no evidence of coronary issues.[127]

52.   Jacobson performed an MRI of Uquillas' lumbosacral spine on July 5, 2005, which showed "no new disk protrusion or extrusion."[128]

53.   Jablecki saw Uquillas on July 11, 2005.   She was taking Baclofen, Soma and Flexeril irregularly.[129]   Jablecki noted that in addition to pain, Uquillas had "a generalized sense of weakness and cognitive difficulties" due to pain medication, "which limit[ed] her

---

[121]*Id.* at 761.

[122]*Id.* at 763.

[123]*Id.* at 715.

[124]*Id.* at 716.

[125]*Id.* at 748.

[126]*Id.* at 805.

[127]*Id.* at 826.

[128]*Id.* at 839, 841.

[129]*Id.* at 838.

activities."[130] He concluded that Uquillas remained "temporarily" totally disabled, through December 31, 2005, relying on her "generalized sense of weakness and cognitive difficulties" in addition to her pain to support this conclusion.[131]

54.  EMG and nerve conduction studies of Uquillas' lower extremities were performed on July 22, 2005.[132] They revealed no new findings.[133]

55.  Baskt saw Uquillas on August 4, 2005. She reported a "huge flare-up" on July 22, 2005 and said her muscles were "too weak to hold her[ ] up."[134]

56.  Jablecki saw Uquillas on August 9, 2005. He noted pain medication usage similar to that recorded on her prior visit.[135] Jablecki performed EMG and nerve conduction studies of Uquillas' lower extremities, and found the results for her left lower extremity "abnormal" and consistent with chronic left L5 radiculopathy.[136] He again concluded that Uquillas remained disabled, relying both on the left L5 radiculopathy and general fatigue and cognitive difficulties.[137]

57.  Jablecki performed EMG and nerve conduction studies of Uquillas' left lower extremity next on November 10, 2005, which were "abnormal" and "unchanged compared to

---

[130]*Id.* at 841.

[131]*Id.*

[132]*Id.* at 873.  These studies are noted in Jablecki's records, but it is uncertain who performed them, as Jablecki did not see Uquillas on that date.

[133]*Id.*

[134]*Id.* at 881.  Defendants cite evidence that around this time, Uquillas was performing some work from home soliciting customers for a company named Grace Fibro-Smile, which was in the business of selling cosmetics to fibromyalgia patients.  (Defendant's Opening Trial Brief ("Def.'s Brief") at 13-15, 18-19.)  However, as defendants admit that "it is not exactly clear how extensive [these] activities were," (*Id.* at 29) the court has not relied on this evidence.

[135]AR at 870.

[136]*Id.* at 1073.

[137]*Id.* at 874.

1    previous studies."[138]

2    58.   An FCE was scheduled for November 15, 2005.  The evaluation was not fully completed,

3          however, because Jablecki would not authorize "physical demand testing."[139]  The FCE

4          report concluded that Uquillas was "minimally capable of sedentary work on a part-time

5          basis for up to 3 hours per day"; it noted that she drove one and half hours both directions

6          to attend the evaluation.[140]

7    59.   Jablecki saw Uquillas on January 17, 2006.  She was not taking pain medications regularly

8          and Jablecki again concluded that she remained disabled, relying both on the radiculopathy

9          and general fatigue and cognitive difficulties.[141]

10   60.   UNUM arranged for an independent medical evaluation of Uquillas on February 9, 2006.

11         Because Uquillas asserted that she could not drive to the location of the examination,

12         Unum hired a limousine service; Uquillas then said she would need to lay down and could

13         not do so in a car seat.[142]  Unum therefore arranged for her to be transported to the IME

14         in an ambulance.[143]

15   61.   Dr. Bradley Chesler conducted the IME, which lasted one hour.[144]  Chesler examined

16         Uquillas "in the seated and standing positions."[145]  He found that she had "a free range of

17   _____

18         [138]*Id.* at 1073.

19         [139]*Id.*

20         [140]*Id.* at 998.

21         [141]*Id.* at 1072, 1075.

22         [142]*Id.* at 1086

23         [143]*Id.* at 1096, 1111.

24         [144]*Id.* at 1123.

25

26         [145]Uquillas told UNUM that Chesler did not examine her physically and simply looked at
     medical records while speaking to her (*id.* at 1200); this contradicts Chesler's report, however,
27   which describes the physical examination in great detail.  The court does not find Uquillas to be
     credible on this point.
28

motion of the joints in the lower extremities."[146]   He observed that she did not walk unsteadily and did not use devices to assist her walking.[147]   Uquillas was able to rise from a sitting position without difficulty and to sit for fifteen to twenty minutes,[148] although she exhibited "significant grimacing and change of facial expression when she was making her movements."[149]   However, "once [Uquillas] was able to arise from her chair and walk to the front desk and then out of the office[, her] gait speed, stride length and facial appearance were more normal without evidence of pain behavior."[150]   Uquillas told Chesler she was able to drive, but limited her driving to her "local area."  She said she was taking medications intermittently.[151]   After conducting the examination and reviewing Uquillas' file, Chesler concluded, among other things, that there was no rational basis for prescribing bed rest, as "[i]t is usually not the standard of the community to enforce bed rest for a lumbar spine and/or nerve condition;"[152] that the sensory deficits revealed in EMG testing were "consistent with an L5 radiculopathy" but more consistent with SI joint pathology;[153] that there was no medical information in the file precluding Uquillas from undergoing a formal FCE;[154] that based "strictly on [his] examination findings," Uquillas could lift, carry, push or pull at least fifteen pounds, could tolerate standing and sitting thirty minutes at a time and "could complete [an] eight hour day in a sedentary capacity,"

---

[146]*Id.* at 1112.

[147]*Id.* at 1118-9.

[148]*Id.* at 1119.

[149]*Id.*

[150]*Id.* at 1121.

[151]*Id.* at 1120, 1121.

[152]*Id.* at 1117.

[153]*Id.*

[154]*Id.* at 1118.

1 | although she would have to avoid stooping and bending.[155]

2 | 62. | Uquillas was seen by Dr. Barry McCown, a chiropractor, on February 20 and 22, 2006.
3 | He observed "severe muscle spasms" in her cervical region, "acute muscle spasms" in her
4 | "lumbar paraspinal musculature," numbness in both legs, reduced motion in her left
5 | cervical region, and "acute reduced motion" in her lumbar region.[156]

6 | 63. | Jablecki saw Uquillas on February 22, 2006.  Uquillas reported that the ambulance ride
7 | to the IME was bumpy and resulted in a flare-up of her pain.[157]  She reported that she was
8 | now taking Soma and Vicodin every four hours.[158]  Based on the conditions he had
9 | previously identified, Jablecki concluded that Uquillas remained totally disabled through
10 | June 30, 2006.[159]

11 | 64. | On April 6, 2006, Dr. Lori Baker performed an MRI of Uquillas' spine.  According to
12 | Jablecki, this MRI revealed that the "disc bulge" was "more prominent" when compared
13 | with prior MRI's.[160]

14 | 65. | On April 12, 2006, Brock again reviewed Uquillas' file.  He noted that she was taking the
15 | previously prescribed pain medications only intermittently, and that the only medicine she
16 | took regularly was Prozac.  He reported that, as with previous visits, "the predominant
17 | clinical examination findings [were] based on claimant responses to palpation and body
18 | part positioning without establishment of anatomic, physiologic or neurologic deficits.[161]
19 | Brock noted Jablecki's comment that general fatigue and cognitive difficulties had become

---

[155]*Id.* at 1122.

[156]*Id.* at 1190.

[157]*Id.* at 1096; see also *id.* at 1456.

[158]*Id.* at 1097.

[159]*Id.* at 1100.

[160]*Id.* at 1458.

[161]*Id.* at 1316.

a "significant component" of Uquillas' condition, but observed that no neuopsychological testing had been conducted nor any pathologic explanation given.[162]   Brock found the results of the clinical examinations unchanged despite Uquillas' claim of increased pain due to the ambulance ride.   He noted Chesler's observation that Uquillas' "gait speed, stride length and facial appearance" improved when she was not being formally examined, and also found significant the fact that Uquillas was not taking narcotic pain medication on a regular basis.[163]   Brock questioned the reliability of the chiropractor's notes, observing that the "severe muscle spasms" he observed were not reported by Uquillas' other physicians and that the chiropractor did not explain how the spasms differed from voluntary tensing of muscles.[164]   Overall, Brock opined that the IME reinforced his earlier conclusion that Uquillas was capable of sedentary work for an eight hour day.[165]

## I.   Second Denial of Benefits

66.   On April 13, 2006, UNUM advised Uquillas that it had determined she could perform the functions of her occupation and was no longer eligible for benefits, although it reserved a final decision pending receipt of psychiatric records.   The letter cited Dr. Chesler's conclusions, and noted that the medical records Uquillas had submitted since the IME did not present any "measurable clinical examination deficits."[166]   The letter did not communicate a final decision, however, as it indicated that UNUM would review the claim further after receiving the requested psychiatric records.[167]

67.   Jablecki did not see Uquillas again until June 26, 2006.   At that time, she reported that the

---

[162]*Id.* 1316-1317.

[163]*Id.* at 1317.

[164]*Id.*

[165]*Id.* at 1318.

[166]*Id.* at 1324-26.

[167]*Id.* at 1325.

"flare-up" allegedly caused by the ambulance ride had gradually improved over several months.[168] She told Jablecki she was not currently taking pain medication.[169] Jablecki noted, however, that Uquillas' condition had not improved in more than two years, and that "it [was] unlikely that she will improve to a point that she will be able to return to work." Jablecki cited radiculopathy and a "general sense of weakness and cognitive difficulties" as the basis for this opinion.[170] As a result, he recommended that Uquillas apply for social security disability benefits.[171]

68.   On June 28, 2006, UNUM advised Uquillas that it was terminating her benefits effective April 12, 2006.[172] The letter noted that the physical requirements of Uquillas' position were lifting ten pounds occasionally and sitting most of the day.[173] It cited the results of the limited FCE and r. Chesler's conclusions.[174] It stated that UNUM had received the psychiatric records, which reported a diagnosis of major depressive disorder, but "provide[d] minimal information regarding the impact of [her] psychiatric symptoms on [her] functioning," and did not "identify any physicians supporting restrictions and limitations attributed to mental disorder."[175] "Based on the information available on file," the letter concluded, UNUM "ha[d] determined [that Uquillas was] not disabled from [her] own occupation."[176]

---

[168]*Id.* at 1456.

[169]*Id.* at 1497

[170]*Id.* at 1460-61.

[171]*Id.*

[172]*Id.* at 1427-32.

[173]*Id.* at 1428.

[174]*Id.* at 1428-29.

[175]*Id.* at 1429.

[176]*Id.* at 1430.

69.  Uquillas appealed this decision on June 28, 2008.  Among other things, she reiterated her claim that Dr. Chesler had not examined her physically.[177]

70.  Uquillas saw Dr. Baskt again on July 12, 2006.  Baskt noted "fair power throughout, but clear weakness of wrist extension" and "brisk" deep tendon reflexes, especially at the knees.  He observed that "[o]ccasional beats of clonus can be induced at the ankles."  His diagnoses were L5 radiculopathy, small fiber neuropathy, and "proximal muscle weakness, apparently resolved."[178]  Dr. Baskt referred Uquillas to a pain management specialist.  Based on Jablecki's reports, he stated that Uquillas was "temporarily disabled, and probably permanently disabled."[179]  Baskt also referred Uquillas to Dr. Lance Altenau, a neurosurgeon.[180]

71.  Altenau examined Uquillas on August 24, 2006.  He observed that "in 2002, [Uquillas] was noted to have left leg damage and a MRI noted no changes."  He also stated that "a recent MRI demonstrated a minimal L4-5 bulging disc, certainly not commensurate with the patient's problem."  According to Altenau, "[r]eview of the thoracic spine and lumbar spine are really not consistent with any type of problem of this severity."  He further noted that Uquillas' "neurologic examination reveals no true focal weakness and although there is some hyperreflexia I could not demonstrate any clonus."  Dr. Altenau observed, however, that "EMG changes have been consistent showing significant nerve damage."[181]  In notes from a follow-up consultation on September 5, 2006, Altenau observed that a "new MRI of the lumbosacral spine [was] really quite normal" and did not "explain

---

[177]*Id.* at 1449.

[178]*Id.* at 1562.

[179]*Id.* at 1563.

[180]*Id.* at 1547.

[181]*Id.*

1   [Uquillas'] severe leg symptoms."[182]

2   72.   Lynne DeBoskey, a psychologist treating Uquillas, prepared a report for UNUM regarding

3        Uquillas' condition on September 5, 2006.  DeBoskey stated that Uquillas had a "greatly

4        lowered tolerance for frustration" and was "frequently fatigued."[183]   She considered

5        Uquillas' "ability to make decisions, interact with others in the work place, and maintain

6        a work schedule [to be] moderately to severely impaired," as was her "ability to maintain

7        a consistent routine."[184]

8   73.   Jablecki saw Uquillas on September 8, 2006.  She complained of numerous symptoms:

9        pain, numbness, tingling and weakness in her left low back, hip, buttock and leg; pain in

10       her right leg that was difficult to describe because it was less intense than pain in the left

11       leg; knee pain and numbness; urinary incontinence with coughing and sneezing; "urine and

12       bowel urgency"; fatigue and exhaustion; problems with memory; numbness in the

13       posterior trunk; and intermittent numbness and tingling of the left lower extremity.[185]

14       Jablecki performed EMG and nerve conduction studies, which he concluded were

15       "compatible with a chronic left L5 radiculopathy" that had progressed "slight[ly]" since

16       November 2005.[186]

17  74.   UNUM medical consultant, Dr. Alan Neuren, a psychiatrist and neurologist, completed

18       a thorough review of Uquillas' file on October 12, 2006.[187]   He noted Uquillas' "ever

19       evolving array of complaints," observing that she "initially presented with complaints of

20       low back pain and left leg pain, but has gone on to develop pain in her right leg and more

21

22   _____

23   [182]Id. at 1549.

24   [183]Id. at 1530.

25   [184]Id. at 1531.

26   [185]Id. at 1570-71.

27   [186]Id. at 1573.

28   [187]Id. at 1591-1600.

diffuse pains." He also noted that clinical and motor findings were "highly variable." According to Neuren, Uquillas' early EMG results were consistent with acute L5 radiculopathy; subsequent results demonstrated only chronic changes, that is, evidence of "an event that occurred in the past, but [that] is no longer active and certainly not progressive." MRI results demonstrated "only mild degenerative changes commonly seen in asymptomatic individuals in [her] age group." Neuren observed that neither the MRI or EMG studies "would account for [Uquillas'] myriad complaints or her highly variable findings." Based on his review of the records, Dr. Neuren concluded that "at most [Uquillas] had sustained a mild irritation of her L5 nerve root"; he expressed "concerns [regarding] symptom embellishment."[188] Neuren found that Uquillas' records supported a diagnosis of acute L5 radiculopathy at the time she ceased working, although the cause of the condition was unclear. He opined that the lack of ongoing acute changes in Uquillas' EMG results indicated that the L5 radiculopathy diagnosed at the time was "a self-limiting non-progressive condition that should have resolved spontaneously within several months"; thus, he found Uquillas' reported lack of improvement and worsening symptoms were not credible. Dr. Neuren's ultimate conclusion was that Uquillas "should have sedentary work capacity."[189]

75.   On November 22, 2006, UNUM medical consultant, Dr. Malcom Spica, a neuropsychiatrist, reviewed Uquillas' file from a cognitive and psychiatric perspective.[190] Dr. Spica concurred with Dr. DeBoskey's diagnosis of a mood disorder beginning September 2006; however, he did not "find adequate evidence to a reasonable degree of professional certainty that [Uquillas'] depressive or cognitive features rose to the level of impairment near her date of disability," and opined that "her level of symptomatology and behavioral health care were not consistent with a debilitating psychiatric disorder." He

---

[188]*Id.* at 1600.

[189]*Id.* at 1601.

[190]*Id.* at 1626-28.

concluded that "[t]here [was] no objective support for cognitive impairment at any time."[191]

76.  On December 7, 2006, Unum advised Uquillas that it had completed its appellate review that it was affirming the denial of benefits.  The letter summarized Uquillas' medical history and cited Dr. Neuren's and Dr. Spica's conclusions.[192]  As respects Uquillas' mental health issues, the letter noted that, although Dr. Spica concurred in the diagnosis of a mood disorder, any disability that commenced in September 2006 would not support payment of benefits because Uquillas' coverage terminated prior to that date.[193]  The letter concluded: "Based on the above reasons, we have determined that you can perform your occupation.  Therefore, we must uphold our previous denial decision."[194]

77.  Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II.  CONCLUSIONS OF LAW

### A.    Standard of Review

78.  The court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989).  "Where the plan vests the administrator with discretionary authority to determine eligibility for benefits, however, a district court may review the administrator's determinations only for an abuse of discretion."  *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 n. 2 (9th Cir. 1994); see also *Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir. 2004) ("[W]here, as here,

---

[191]*Id.*

[192]*Id.* at 1640-41.

[193]*Id.* at 1642.

[194]*Id.*

a plan administrator has 'discretionary authority to determine eligibility for benefits,' we review the benefits decision for abuse of discretion"), cert. denied, 125 S.Ct. 62 (2004). Here, the parties do not dispute that the plan documents confer discretion on UNUM, and that abuse of discretion is therefore the appropriate standard of review.[195]   Uquillas contends, however, that UNUM's decisions are entitled to minimal deference only because it operated under a conflict of interest.

79.   Where an administrator operates under a conflict of interest, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115; see also *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 384 n. 15 (2002) ("[R]eview for abuse of discretion [should] home in on any conflict of interest on the plan fiduciary's part, if a conflict was plausibly raised"); see also *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2003) (quoting *Firestone*).

80.   Prior to 2006, the Ninth Circuit held that where a plan participant showed "material, probative evidence [of a conflict of interest], beyond the mere fact of the apparent conflict," the burden shifted to the plan to show that no conflict affected its decision.  See *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1323 (9th Cir. 1995).  If the plan could not "carry that burden, [the court was directed to] review the decision *de novo*, without deference to the administrator's tainted exercise of discretion." *Id*.  In 2006, an *en banc* panel of the Ninth Circuit overruled *Atwood* after concluding that it was inconsistent with *Firestone*.  See *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006) ("[W]e overrule *Atwood* in its entirety and, instead, adopt an approach that, we believe, more accurately reflects the Supreme Court's instructions in *Firestone*.")  The *Abatie* court held that *Firestone* "require[s] abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record."

---

[195]Plaintiff's Trial Brief ("Pl.'s Brief") at 12; Def.'s Brief at 22.

*Id.* Thus, no matter the degree to which a conflict of interest affects the plan administrator's decision, the standard of review remains abuse of discretion. The existence of a conflict, and its extent, are merely factors to be considered in determining whether the administrator abused its discretion in deciding the claim. See *id.* ("A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might"); see also *Metro. Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343, 2351 (2008) (stating that an administrator's conflict of interest may be an important factor if "circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration"); *Abatie*, 458 F.3d at 968 (the importance of a conflict may be low if there is no "evidence of malice, of self-dealing, or of a parsimonious claims-granting history").

81. Accordingly, the court reviews UNUM's determination to deny Uquillas LTD benefits for abuse of discretion.

**B.    Standard Governing Abuse of Discretion Review**

82. In assessing whether an ERISA fiduciary has abused its discretion, courts consider factors such as whether the benefits decision conflicts with the plain language of the plan (see *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995), cert. denied, 516 U.S. 908 (1995)), whether the fiduciary failed to provide an explanation of its decision (*Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1108 (9th Cir. 2003)), and whether the fiduciary made clearly erroneous findings of fact supporting the benefits determination (see *id.*; *Taft*, 9 F.3d at 1472); see *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999) ("[I]t is an abuse of discretion for ERISA plan administrators to render decisions without any explanation, or to construe provisions of the plan in a way that conflicts with the plain language of the plan"; *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th Cir. 1998)

30

("Although . . . an ERISA administrator is entitled to substantial deference, it still must have some reasonable basis for its decision denying benefits"); *Atwood*, 45 F.3d at 1323-24 ("It is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact"); *Siebert v. Standard Ins. Co.*, 220 F.Supp.2d 1128, 1141 (C.D. Cal. 2002) ("Generally, ERISA plan administrators abuse their discretion if they render decisions without any explanation or in a way that conflicts with the plain language of the Plan, or that are based on clearly erroneous findings of fact").

83.   Under *Abatie*, the court must also assess whether a conflict of interest is apparent on the record and what effect that conflict has on the deference accorded the administrator's decision.  See *Abatie*, 458 F.3d at 969 ("A straightforward abuse of discretion analysis allows a court to tailor its review to all the circumstances before it"); see also *Rush Prudential HMO*, 536 U.S. at 384 n. 15 ("An issue implicated by this case but requiring no resolution is the degree to which a plan provision for unfettered discretion in benefit determinations guarantees truly deferential review. . . .  It is a fair question just how deferential the review can be when the judicial eye is peeled for conflict of interest"). Ultimately, abuse of discretion review "is inherently flexible, [and] enables reviewing courts to simply adjust for the circumstances."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir. 1998) (quoted with approval in *Abatie*, 458 F.3d at 968); see also *Abatie*, 458 F.3d at 969 (noting that abuse of discretion review, with conflict weighed as a factor, is "indefinite," and involves "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records").

## C.   UNUM's Decision Was Not an Abuse of Discretion

84.   UNUM's decision to terminate Uquillas' long-term disability benefits was not an abuse of discretion because it considered the spectrum of available medical evidence and reached a conclusion that was supported by substantial evidence.  The decision did not conflict with

1    the plain language of the plan and was not based on clearly erroneous findings of fact.

2    85.   Substantial evidence supported Dr. Neuren's conclusion, adopted in UNUM's final letter,

3    that Uquillas' increased symptoms of pain in December 2003 were the result of an acute

4    L5 radiculopathy that should have resolved over a period of several months.   It is

5    undisputed that Uquillas developed an L5 radiculopathy in December 2003; Jablecki

6    diagnosed Uquillas with radiculopathy when he first saw her due to increased pain on

7    December 24, 2003.[196]   The parties' dispute concerns whether it was reasonable for

8    UNUM to conclude that this initial condition no longer supported Uquillas' claim that she

9    was unable to perform her sedentary occupation.

10   86.   Dr. Jablecki consistently cited EMG and nerve conduction study results as substantiating

11   Uquillas' claims of increased symptoms.   Dr. Neuren concluded, however, that, based on

12   the lack of acute changes in these studies, that the radiculopathy should have resolved

13   spontaneously over several months.[197]   This opinion is consistent with Jablecki's initial

14   prognosis for Uquillas.[198]   He anticipated a spontaneous resolution and predicted that

15   Uquillas would recover by the end of March 2004.   Consistent with Dr. Neuren's

16   conclusion, EMG and nerve conduction studies on February 17, 2004,[199] July 22, 2005,[200]

17   and November 10, 2005[201] showed no change from the December 24, 2003 results, and

18   Jablecki noted only a "slight" change on September 8, 2006.   Dr. Jablecki described

19   Uquillas' condition as "chronic" beginning January 2005,[202] and Dr. Neuren explained that

---

[196]AR at 106.

[197]Id. at 1601.

[198]Id. at 139

[199]Id. at 142.

[200]Id. at 873.

[201]Id. at 1073.

[202]Id. at 589.

chronic radiculopathy would not support symptoms of increasing pain.[203]   Dr. Brock expressed similar concerns regarding the inconsistency between Uquillas' complaints and documented clinical findings.[204]   Moreover, Dr. Altenau, a neurologist neither associated with nor hired by UNUM, expressed the opinion that the clinical findings were not "commensurate with [Uquillas'] problem."[205]   Other than Dr. Jablecki, the only doctor who considered Uquillas disabled was Dr. Baskt.  Dr. Baskt was selected by Uquillas' counsel, however, and appears simply to have adopted Jablecki's conclusion regarding Uquillas' disability.[206]   UNUM did not abuse its discretion in relying on Dr. Neuren's conclusions rather than Dr. Jablecki's, particularly as they were supported by a non-UNUM affiliated physician, Dr. Baskt.  See *Maniatty v. UNUMProvident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002) (upholding UNUM's decision to rely on the reports of UNUM's reviewing doctor and reviewing nurse where "the administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints.  In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator").

87.   The record presents several reasons to believe that Dr. Jablecki's continued findings of disability after the point at which Uquillas should have been expected to recover from the radiculopathy were unreliable.   First, considering the fact that several medical professionals indicated that extended periods of bed rest were inappropriate treatment for

---

[203]*Id.* at 1600-01.

[204]*Id.* at 625.

[205]*Id.* at 1547.

[206]*Id.* at 761, 882 ("Disability is per Dr. Jablecki").

radiculopathy,[207] and the fact that Uquillas ceased seeing the doctor who initially prescribed bed rest after two visits,[208] Dr. Jablecki's continued recommendation of bed rest in the face of Uquillas' lack of reported improvement somewhat calls his judgment regarding Uquillas' case into question.  Further, Dr. Jablecki's regular reliance, as of July 11, 2005,[209] on vague notions of "a generalized sense of weakness" and undocumented "cognitive defects" to support his continued finding of disability suggest an awareness that the diagnosis of radiculopathy alone could not reasonably support Uquillas' continued claims.  Jablecki also concluded that Dr. Jacobson's MRI finding of mild disc protrusion on December 8, 2004 might provide a new explanation for Uquillas' condition,[210] although Dr. Jacobson considered the MRI an "essentially normal study."[211]  Dr. Jablecki's notes, moreover, indicate that the protrusion had been documented as early as December 6, 2003, and he had not previously considered it a cause of Uquillas' problem.[212]  These facts support UNUM's decision to rely on physicians other than Jablecki.  That decision is further supported by the fact that plan administrators are not required to accord deference to treating physicians.  See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

88.   UNUM also reasonably relied on concerns that Uquillas was exaggerating her symptoms.  Considering all the evidence in the record, the court finds that there was substantial justification for UNUM's concerns in this regard.  First, the inconsistencies in Uquillas'

---

[207]*Id.* at 412, 1117.

[208]*Id.* at 433.

[209]*Id.* at 841.

[210]*Id.* at 588.

[211]*Id.* at 593.

[212]*Id.* at 104.

accounts of the onset of her disability undermine her credibility.[213]  The possibility of recovering on a worker's compensation claim provides an obvious motivation for Uquillas to change her explanation of the onset of her symptoms.  Similarly, Uquillas was inconsistent as to whether she ceased work in January 2004 because her physicians told her to do so or because she could not tolerate the pain.[214]  Both Ed Ruiz and Dr. Chesler observed Uquillas engage in behavior inconsistent with her claimed symptoms and limitations.[215]  For these reasons, UNUM could reasonably have doubted that Uquillas' pain was as severe as she claimed, considering that Dr. Jablecki did not initially expect the condition to endure beyond March 2004; that Uquillas took pain medication only irregularly and often reported taking none at all; and that several physicians believed the objective findings did not support her described symptoms.

89.   UNUM also acted reasonably in relying on Dr. Chesler's IME.  Uquillas asserts that UNUM unreasonably discounted her claim that Chesler did not physically examine her without investigating the accusation further.[216]  She suggests that this failure to investigate was motivated by UNUM's inherent conflict of interest.  Under the circumstances, however, it was not unreasonable for UNUM to credit Chesler over Uquillas without further investigation.  The court has already discussed Uquillas' credibility problems.  Moreover, Dr. Chesler's report contains detailed descriptions of the physical examination he conducted, noting, among other things, Uquillas' reactions to touch and pressure.[217]  Absent a specific reason to doubt Dr. Chesler's credibility – which Uquillas has not provided – the court does not find the suggestion that he would fabricate a detailed

---

[213]See Finding Nos. 5-7.

[214]See Finding No. 15.

[215]AR at 500-01, 1121.

[216]Pl.'s Brief at 18.

[217]AR at 1117.

description of a physical examination believable.  As a consequence, the court concludes that UNUM did not abuse its discretion by relying on Chesler's IME.  See *DiPietro v. Prudential Ins. Co. of America*, No. 03 C 1018, 2004 WL 626818, *6 (N.D. Ill. Mar. 26, 2004) ("Insurance providers are not required to seek independent medical evaluations, but an evaluation by the insurer is evidence of a thorough investigation into the claim"); *Conti v. Equitable Life Ins. Assurance Society,* 227 F.Supp.2d 282, 292 (D.N.J. 2002) (concluding that an insurer's decision to deny benefits was not an abuse of discretion where it elected to accept the opinion of the physician who performed an independent medical review rather than the reports of plaintiff's treating physicians); *Rosenthal v. First Unum Life Ins. Co.*, No. 00 Civ 3204, 2002 WL 975627, *7 (S.D.N.Y. May 9, 2002) (holding that it was not an abuse of discretion to deny benefits despite an opinion from plaintiff's treating cardiologist that he was disabled because the administrative record contained an independent medical opinion and in-house medical reviews of plaintiff's file that supported the administrator's determination); compare *Morgan v. Unum Life Ins. Co. of America*, No. Civ. 01-1796, 2002 WL 31095391, *4 (D. Minn. Sept. 16, 2002) (holding that administrator abused its discretion by failing to obtain or rely upon any evidence contradicting plaintiff's showing of disability, and noting that, "had UNUM been dissatisfied with the medical evidence submitted by [plaintiff's] physicians, it could have submitted him to an independent medical examination.  Had it done so, it could have relied on any resulting contrary opinion of an independent examiner" (citations omitted)); *Vartanian v. Metropolitan Life. Ins. Co.*, No. 01 C 2674, 2002 WL 484852, *10 (N.D. Ill. Mar. 29, 2002) (finding that it was an abuse of discretion for an administrator that had failed to obtain an IME to deny benefits in the face of multiple, consistent reports confirming a diagnosis of CFS, and stating: "Met Life relied solely on reviewing doctors['] opinions over those of [plaintiff's] treating doctors.  Were MetLife acting in good faith in terminating [plaintiff]'s benefits, it seems it should have hired an independent physician to actually examine [plaintiff].  Had this been done and properly documented, there would be no basis to overturn the decision").

90.   Uquillas' argument that the record so strongly support her claim of disability that UNUM's decision must be reversed even if the court affords UNUM substantial deference is uncompelling.[218]   Uquillas cites the MRI findings of disc protrusion and notes that the protrusion was "more prominent" in a June 2006 MRI.[219]   What is lacking in the record is any explanation as to how these findings were consistent with the sort of symptoms Uquillas reported, however.   In fact, Dr. Altenau, who was not hired by UNUM, concluded that the MRI findings did not support Uquillas' symptoms.[220]   Dr. Jablecki, moreover, relied on EMG and nerve conduction studies rather than the MRI's.   Uquillas cites Dr. Chesler's finding that she was unable to stand solely on her left leg and his observation of "tenderness" in her lumbar area as support for her position.[221]   These findings are hardly as severe as Uquillas' claimed symptoms, however, and Uquillas does not explain how "tenderness" and the inability to stand on one leg would render her unable to perform a sedentary occupation for eight hours a day.[222]   Her citation of Dr. Chesler's observation of "significant grimacing" as support for her claim is puzzling, considering his statement that he believed Uquillas was exaggerating her facial expressions.[223]   Uquillas' suggestion that UNUM's reliance on Dr. Chesler's report was unreasonable because it never sent the report to her physicians is similarly not compelling.[224]   Given the predictability of Dr. Jablecki's conclusions, seeking his comment on the report would have been minimally, if at all, helpful.   Uquillas cites her chiropractor's observation of muscles

---

[218]Pl.'s Brief at 19.

[219]AR at 1458; Pl.'s Brief at 20; Pl.'s Reply at 15.

[220]AR at 1547-49.

[221]Pl.'s Brief at 22.

[222]*Id.*

[223]AR at 1121.

[224]Pl.'s Brief at 23.

spasms but fails to connect these spasms to the severity of her pain or her ability to perform her sedentary occupation.[225]   The court is likewise not persuaded by Uquillas' reliance on the results of the FCE;[226] although the evaluation concluded, in contrast to Dr. Neuren's opinion, that Uquillas could tolerate a three-, rather than an eight-hour work day, the report contains little explanation of the reasoning behind its conclusions.   Moreover, Uquillas' lack of participation prevented completion of the FCE; it appears possible that the finding of a three-hour sedentary capacity was based solely on the fact that Uquillas drove ninety minutes in each direction to reach the location of the examination.[227]   In short, while some of the cited evidence supports Uquillas' claim, other evidence did not. Considering all of the evidence, the court cannot say that UNUM abused its discretion in concluding that Uquillas was not disabled.

91.   The court has considered the conflict of interest inherent in UNUM's dual role as administrator and payor.   Considering the substantial evidence weighing in favor of UNUM's decision, the legitimate reasons for questioning Uquillas' reported symptoms, and the relative lack of support for her claim of disability from any source other than Dr. Jablecki, the court cannot find that this inherent conflict of interest mandates the conclusion that UNUM abused its discretion.   Uquillas places great weight on UNUM's documented history of "parsimonious claims granting."   See e.g., *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008).   She cites numerous cases

---

[225]Pl.'s Reply at 15.

[226]*Id.* at 5.

[227]Uquillas' reliance on "cognitive defects" and psychiatric symptoms is unavailing. (Pl.'s Brief at 20).   First, there is no clear documentation of the alleged cognitive defects.  There is at least some suggestion that Dr. Jablecki used the term to refer to the effect of Uquillas' medication on her memory.  As respects Uquillas' mood disorder diagnosis, there is no evidence that the condition existed at the time of her claimed disability.   Additionally, the diagnosis of "moderate to severe" impairment describes a wide range of impairment that, standing alone, does not demonstrate total inability to perform the duties of Uquillas' position.

criticizing UNUM's historical claims practices.[228]  She makes no effort, however, to identify any similarities between the conduct criticized in those cases and UNUM's handling of her claim.  Although, the court has reviewed the record with some additional skepticism given the company's history, it concludes that that history, without more, does not compel the conclusion that it reviewed Uquillas' claim improperly.  This is particularly true given evidence in the record supporting UNUM's benefits determination.  See *Hughes v. UnumProvident Corp.*, No. C 07-4088 PJH, 2008 WL 4452140, *7 (N.D. Cal. Oct. 3, 2008) ("In this case, Unum's decision to deny plaintiff benefits is credible.  Plaintiff asserts that Unum has had a history of biased claims administration.  The court accordingly considers Unum's decision to deny plaintiff benefits with an increased level of skepticism.  See *Abatie*, 458 F.3d at 968.  However, plaintiff has not demonstrated that Unum was biased in the instant case, and the court will not assume that Unum is biased every time it denies a claimant benefits merely because it has a parsimonious claims-granting history.  As a result, the court finds that Unum's history does not outweigh the evidence in the record supporting its decision to deny plaintiff benefits.  Accordingly, the court concludes that Unum's decision, even when viewed with skepticism, was credible and not an abuse of discretion"); *Baldoni v. UnumProvident*, Civil No. 03-1381-AS, 2008 WL 140716, *5 (D. Or. Jan. 9, 2008) ("For every case cited by Baldoni as an example of UNUM exerting an abuse of discretion in the claims denial process, UNUM is able to cite a case in which UNUM did not impose an abuse of discretion.  Moreover, Baldoni does not offer any evidence, or even argument, linking the decision-making process in the cited cases to the claim practices used here.  Nor does Baldoni offer an explanation for the relevance of the cited cases to UNUM's decision to deny him LTD benefits in this case.  Presumably, Baldoni is asking the court to assume that if UNUM acted improperly in his cited cases, it must have done so in his case.  In order for the court to conclude that UNUM acted improperly here based on the cases cited by Baldoni, the court must arbitrarily ignore

---

[228]Pl.'s Brief at 15-16.

UNUM's case law supporting the corollary – that UNUM acted properly in denying Baldoni's claim because it has done so in other cases.  Both parties have set forth cases of past performances by UNUM, favorable and unfavorable.  Neither party has made a direct link between the decisions in those cases and UNUM's conduct in this case"); see also *Pacioni v. Unum Life Ins. Co. of America*, No. 08-15609, 2009 WL 2011533, *1 (9th Cir. June 24, 2009) (Unpub. Disp.) ("Nor did the district court err in concluding that the information regarding UNUM's historical practices was not relevant to Pacioni's claim").

92.   Uquillas contends that the court must review the record with heightened skepticism because UNUM failed to detail the reasons for its denials in its letters to her.[229]  All the letters identify specific facts from Uquillas' medical records supporting UNUM's decisions.  Uquillas argues that because UNUM's letters did not "compare, contrast, or attempt to reconcile those facts with the ones that weighed in favor of a disability finding," it failed in its obligation to provide the reasons for the benefits decision.  She contends this failure evinces the influence of the inherent conflict of interest.[230]  While emphasizing medical reports that favor a denial of benefits and deemphasizing those that support a contrary conclusion can be evidence of the influence of a conflict of interest, see *Glenn*, 128 S.Ct. at 2352, the Supreme Court has cautioned that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians' evaluation, *Nord*, 538 U.S. at 834.  Certain of the letters UNUM sent Uquillas cited Dr. Jablecki's, Dr. Marshall's, Dr. Baskt's and Dr. DeBoskey's conclusions as well as those of UNUM experts such as Dr. Chesler, Dr. Neuren and Dr. Spica.[231]  Read in combination, the letters indicate that UNUM considered not only the opinions of the medical experts it retained to evaluate Uquillas, but the opinions of her treating and/or consulting physicians as well.  While a more fulsome

---

[229]*Id*. at 16-18.

[230]*Id*. at 17.

[231]See *id*. at 556-59; 1636-41

explanation of UNUM's benefits decision in earlier letters might have been preferable, the court cannot conclude either that UNUM failed to satisfy 29 C.F.R. 2560.503-1(f) or that its benefits decision was influenced by the conflict of interest inherent in its dual role as claims administrator and claims payor.   UNUM reasonably credited Dr. Neuren's conclusion, based on his thorough examination of all the evidence in the record, that Uquillas' claims of continued and worsening symptoms of pain were exaggerated and not sufficiently supported by objective evidence.  It reasonably credited his resulting opinion that Uquillas could perform the functions of her sedentary occupation, as well as Dr. Chesler's opinion, based on his examination of Uquillas, that she could work for eight hours in a sedentary capacity.  Accordingly, it did not abuse its discretion.

93.   Any conclusions of law that are deemed to be findings of fact are incorporated herein as such.

### III. CONCLUSION

Based on the findings of fact and conclusions of law set forth above, the court concludes that UNUM is entitled to have judgment entered in his favor.

DATED: January 21, 2010

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE